# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

IN RE APPLICATION OF THE          )
UNITED STATES OF AMERICA FOR      )
AN ORDER PURSUANT TO              )        Mag. No. 14-2528 (DEA)
18 U.S.C. § 2703(d) - TELEPHONE   )
                                  )

## APPLICATION OF THE UNITED STATES
## FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)

The United States of America, moving by and through its undersigned counsel,

respectfully submits under seal this *ex parte* application for an Order pursuant to 18 U.S.C.

§ 2703(d). The proposed Order would require AT&T, a cellular service provider located at

11760 US Highway One, North Palm Beach, Florida, to disclose certain records and other

information pertaining to the subscriber as described in Part I of Attachment A. The records and

other information to be disclosed are described in Part II of Attachment A to the proposed Order.

In support of this application, the United States asserts:

## LEGAL BACKGROUND

1.      AT&T is a provider of an electronic communications service, as defined in 18

U.S.C. § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2).

Accordingly, the United States may use a court order issued under § 2703(d) to require AT&T to

disclose the items described in Part II of Attachment A. *See* 18 U.S.C. § 2703(c)(2) (Part II.A of

Attachment A); 18 U.S.C. § 2703(c)(1) (Part II.B of Attachment A).

2.      This Court has jurisdiction to issue the proposed Order because it is "a court of

competent jurisdiction," as defined in 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(d). Specifically,

the Court has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

3.     A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

<u>THE RELEVANT FACTS</u>

4.     The United States is investigating a criminal enterprise that kidnaps Orthodox Jewish husbands who refuse to consent to divorce their estranged wives. The investigation concerns possible violations of, inter alia, 18 U.S.C. § 1201. I have been informed by the Federal Bureau of Investigation ("FBI") of the specific and articulable facts set forth below, which I believe show that there are reasonable grounds to believe that the records and other information requested in this application are relevant and material to the ongoing criminal investigation.

**Background of the Investigation**

5.     According to Jewish law, in order to effect a divorce, a husband must provide his wife with a document known as a "*get*." Although a divorce may only be initiated by the husband issuing a *get*, the wife has the right to sue for divorce in a rabbinical court, known as a "*beth din*" which may order the husband to issue the *get*. If the husband refuses the court's demand, he may be subjected to various penalties in order to pressure him into consenting to the divorce, i.e., giving the *get*. A woman whose husband will not consent to a divorce is known as an "*agunah*" ("*agunot*" in plural).

2

US 054346

6.      The criminal enterprise under investigation in this matter operates as follows. First, the family of an *agunah* makes contact with the enterprise to explain the divorce situation. The family then makes some type of payment to the enterprise, after which point the *beth din* is convened. The *beth din* issues a contempt order, known as a "*seruv*," against the husband. If the husband fails to respond, the *beth din* issues a ruling, known as a "*psak din*," authorizing the use of coercion and/or violence to obtain the *get*. The enterprise then arranges to kidnap the recalcitrant husband and torture him until he consents to the divorce, i.e., until he "gives the *get*."

### The Target Facilities

7.      The MENDEL EPSTEIN is a Jewish Rabbi, who is a member of an enterprise which conducts kidnappings of Orthodox Jewish husbands who refuse to consent to divorce their estranged wives. The families of the wives pay up to $100,000 to facilitate these kidnappings. The victim husbands are often beaten severely and sometimes shocked with stun guns. Many of the victims require hospitalization and suffer permanent debilitating injuries. To date, the investigation has identified over twenty kidnappings. MENDEL EPSTEIN has an AT&T cellular telephone with an assigned number of 917-696-9146. ("Target Facility 1").

8.      JAY GOLDSTEIN is a Jewish Rabbi who resides in Brooklyn, New York. GOLDSTEIN is often present for the actual kidnapping and assault of the recalcitrant husband, acting as the "scribe" during the forced *get*. The scribe is a person who is specially trained to document the *get* on parchment paper using Hebrew calligraphy. JAY GOLDSTEIN has an AT&T Cellular telephone with an assigned number of 917-929-3223. ("Target Facility 2").

9.      DAVID EPSTEIN is MENDEL EPSTEIN's son and resides in Lakewood, New Jersey. DAVID EPSTEIN works for MENDEL EPSTEIN and is involved in making the

US 054347

arrangements to conduct the kidnapping and obtain the forced *get*.  DAVID EPSTEIN is frequently directly involved in the actual kidnapping and assault of the recalcitrant husband.

10.     MENDEL EICHENTHAL resides in Brooklyn, New York.  EICHENTHAL works for MENDEL EPSTEIN and is involved in making the arrangements to conduct the kidnapping and obtain the forced get.  Occasionally EICHENTHAL is present for the actual kidnapping and assault of the recalcitrant husband.  EICHENTHAL has an AT&T Cellular telephone with an assigned number of 347-263-1374.  ("Target Facility 3").

11.     DAVID HELLMAN was a participant in the actual kidnappings and assaults of the recalcitrant husbands to coerce them into giving the get.  HELLMAN has an AT&T Cellular telephone with an assigned number of 310-666-1425.  ("Target Facility 4").

**The Kidnappings**

12.     In a recorded conversation on or about August 14, 2013, MENDEL EPSTEIN admitted to planning, approving and committing numerous kidnappings.  Specifically, MENDEL EPSTEIN claimed that his organization kidnaps a recalcitrant husband approximately every year or year and a half.  The investigation to date has identified more than twenty kidnappings that appear to have been committed by the Targets.  Summaries of four such kidnappings and attempted kidnappings are set forth below.

**The 2009 Kidnapping**

13.     According to a victim, "Victim 1," in 2009, he and his then-wife were engaged in a contested divorce.  During the summer of 2009, Victim 1 and his then-wife separated and he moved out of the family home to another residence in Brooklyn, New York.

14.     In November 2009, Victim 1 received an unsolicited phone call from an individual ("CC-1") concerning a sales job opportunity at CC-1's company in Lakewood, New

US 054348

Jersey. After an interview, CC-1 offered the job to Victim 1. Victim 1 accepted the job offer and moved to a temporary residence in Lakewood, New Jersey, to begin working for CC-1.

15.    On or about December 1, 2009, CC-1 asked Victim 1 to stay late at the office in Lakewood for a private meeting. Victim 1 agreed and waited for CC-1 to arrive.

16.    At approximately 7:00 p.m., Victim 1 went out to the office parking lot to place his belongings in the trunk of his car. As Victim 1 closed the trunk of the car, two men approached Victim 1 and began physically attacking him. The two men then dragged Victim 1 into a van parked near Victim 1's car. A third man was sitting in the driver's seat of the van. Inside the van, the men pulled Victim 1's jacket over his head, bound his head with tape, and bound his hands and arms with zip ties and duct tape. The van departed the parking lot with Victim 1 inside.

17.    After several minutes of driving, the van pulled off the side of the road and stopped. The men then began beating Victim 1, kicking and punching him. The men told Victim 1 that they were sent by Victim 1's then-wife to obtain a get from him and that they were willing to do whatever needed to be done, including breaking Victim 1's bones. Victim 1 was then electrically shocked with a stun gun on his fingers and genitals.

18.    At some point during the beating, a rabbi carrying a video camera also entered the front seat of the van. The rabbi told Victim 1 to repeat the words necessary to consent to a get. Victim 1 initially refused, at which point the driver of the van began stomping on Victim 1. After a few minutes of beating, Victim 1 relented and recited the words as directed by the rabbi.

19.    Victim 1 was then driven in the van to another location, where he was tossed out of the van. The van drove off and Victim 1 was left on the side of the road. Victim 1 then made his way to a nearby house, where he was able to call for help. Victim 1 was then transported to a

US 054349

hospital emergency room, where he was treated for broken ribs, a bruised spine and other injuries.

20.     Victim 1 was shown a photo array and positively identified DAVID EPSTEIN as one of the men who attacked him on or about December 1, 2009.

**The 2010 Kidnapping**

21.     According to another victim, "Victim 2," in 2010, he was separated from his wife, who was seeking a divorce. Victim 2 had also refused to grant his wife a *get*.

22.     According to a co-conspirator ("CC-2"), CC-2 arranged with MENDEL EPSTEIN to lure Victim 2 to CC-2's residence in Lakewood, New Jersey in order to force Victim 2 to consent to a *get*. According to CC-2, he and MENDEL EPSTEIN were to be paid approximately $100,000 by CC-2's wife's family to obtain the *get*.

23.     On or about October 17, 2010, Victim 2, who resides in Brooklyn, New York was lured to CC-2's house in Lakewood, New Jersey, under the pretext of a business meeting. Upon arrival at CC-2's house, Victim 2 was jumped and assaulted by CC-2 and two other men. According to CC-2, one of these men was DAVID EPSTEIN. Victim 2 was punched in the face, handcuffed, blindfolded and his legs were bound. CC-2 also participated in the physical assault of Victim 2. Victim 2 was told that the purpose of his abduction and attack was to force him into consenting to a Jewish divorce. While Victim 2 was being assaulted, GOLDSTEIN arrived and recorded the *get*.

**The 2011 Kidnapping**

24.     According to another victim, "Victim 3," in 2011, he was separated from his wife, who was seeking a divorce. Victim 3 had also refused to grant his wife a *get*.

6

25.     According to Victim 3, on August 22, 2011, Victim 3 and his roommate were in their apartment in Brooklyn, New York, when approximately six men forced their way inside. Both Victim 3 and his roommate recognized one of the men as EICHENTHAL, and both believed one of the other men was DAVID EPSTEIN.  Victim 3 and his roommate were then punched in the face, handcuffed, blindfolded and their legs were bound.  Both Victim 3 and his roommate recall the attackers demanding Victim 3 to consent to a *get*, though Victim 3 refused to do so.

26.     HELLMAN admitted his involvement in this forced get in his guilty plea allocution on June 19, 2014.

### The 2012 Attempted Kidnapping

27.     According to a victim, "Victim 4," in 2012, he was separated from his wife, who was seeking a divorce.  Victim 4 also refused to give his wife a *get*.

28.     Victim 4 stated that on or about July 29, 2012, at about 5:50 p.m., he was in Merion Station, Pennsylvania, when he was assaulted by three masked men.  Victim 4 stated that he was able to escape from the assault and saw the men drive away in a silver mini-van with a New York license plate.

### The Undercover Operation

29.     As part of this investigation, the FBI conducted an undercover operation in which an undercover FBI Special Agent ("UCE-1") posed as an Orthodox Jewish wife whose husband was unwilling to consent to a divorce, and a second undercover FBI Special Agent ("UCE-2") posed as the brother of UCE-1, who was willing to pay for a kidnapping in order to coerce UCE-1's recalcitrant husband into consenting to a divorce.  (Hereinafter, UCE-1's purported husband will be referred to as "the Husband").

US 054351

30.     On October 8, 2013, UCE-2 met with MENDEL EPSTEIN at his residence in Kings County, New York. The meeting was consensually audio recorded by UCE-2. During the course of the meeting, MENDEL EPSTEIN and UCE-2 discussed MENDEL EPSTEIN's prior kidnappings as well as the details for the planned October 9, 2013, kidnapping of the Husband. MENDEL EPSTEIN told UCE-2 that eight people would be present for the kidnapping, to include four "tough guys," two witnesses, a sofer, and a person to accept the get on behalf of UCE-1. MENDEL EPSTEIN stated that he would not be present for the kidnapping; rather, he would be in some public place, so that witnesses could confirm his alibi if he were later questioned by the police. MENDEL EPSTEIN directed UCE-2 to bring a check for $30,000, made out to MENDEL EPSTEIN, and to give the check to the sofer at the Warehouse.

31.     On October 9, 2013, GOLDSTEIN, HELLMAN and six other individuals (collectively, the "Kidnap Team") traveled to a warehouse in Middlesex County, New Jersey (the "Warehouse") to execute the planned kidnapping and forced get. At approximately 8:00 p.m., UCE-2 arrived at the Warehouse. Shortly thereafter, the Kidnap Team arrived at the Warehouse in two dark minivans. Upon exiting the minivans, some of the Kidnap Team members put on masks and entered the Warehouse office with UCE-2, while the remaining Kidnap Team members walked around the outside of the Warehouse with flashlights.

32.     Over the next fifteen minutes, members of the Kidnap Team went in and out of the Warehouse office wearing ski masks, Halloween masks or bandanas. While inside the Warehouse office, the Kidnap Team members discussed their plan for assaulting the Husband. Specifically, they discussed how they planned to grab the Husband, pull him down, tie him up, and take his phone, as well as where they would grab him and drag him, making sure to keep him away from the windows.

US 054352

33.   At approximately 8:20 p.m., UCE-2 left the Warehouse, purportedly to get the Husband.  Approximately three minutes later, law enforcement moved into the Warehouse office and arrested the eight members of the Kidnap Team.  One member of the Kidnap Team was wearing a garbage bag over his clothes; another member was wearing a Metallica t-shirt over his clothes.  Law enforcement searched the Warehouse office and seized, inter alia, the following items that the Kidnap Team had brought with them to use during the kidnapping and forced get: masks, rope, surgical blades, a screwdriver, plastic bags, and items used to ceremonially record the get (e.g., a board with string attached, feather quills and ink bottles).

34.   HELLMAN admitted his involvement in the conspiracy and the 2011 forced get in his guilty plea allocution on June 19, 2014.  Additionally, MENDEL EPSTEIN, GOLDSTEN, DAVID EPSTEIN, and EICHENTHAL have been indicted in connection with the undercover operation and in connection with some of the substantive kidnappings.  (*See,* Superseding Indictment in *United States v. Mendel Epstein et al.,* 14-287 (FLW)).

<u>REQUEST FOR ORDER</u>

35.   The facts set forth in the previous section show that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.  Specifically, these items will help the United States to identify the location of alleged participants in the scheme during the time periods when the alleged kidnappings and attempted kidnappings occurred.

9

36.     Accordingly, the United States requests that AT&T be directed to produce all items described in Part II of Attachment A to the proposed Order.

Respectfully submitted,

PAUL J. FISHMAN
UNITED STATES ATTORNEY

R. Joseph Gribko
Sarah Wolfe
Assistant United States Attorneys
District of New Jersey

10

## ATTACHMENT A

**I.    The Account(s)**

The Order applies to certain records and information associated with the following four (4) telephone numbers:

1.  917-696-9146

2.  917-929-3223

3.  347-263-1374

4.  310-666-1425

**II.    Records and Other Information to Be Disclosed**

AT&T is required to disclose the following records and other information, if available, to the United States for each account or identifier listed in Part I of this Attachment ("Account"), for the following five (5) time periods:

1.  November 1, 2009 through December 3, 2009;

2.  October 15, 2010 through October 20, 2010;

3.  August 19, 2011 through August 24, 2011;

4.  July 26, 2012 through July 31, 2012;

5.  October 5, 2013 through October 10, 2013;

A.    The following information about the customers or subscribers of the Account:

    1.    Names (including subscriber names, user names, and screen names);

    2.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    3.    Local and long distance telephone connection records;

    4.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    5.    Length of service (including start date) and types of service utilized;

US 054355

6.      Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"));

7.      Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

8.      Means and source of payment for such service (including any credit card or bank account number) and billing records.

B.      All records and other information (not including the contents of communications) relating to the Account, including:

1.      Records of user activity for each connection made to or from the Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;

2.      Information about each communication sent or received by the Account, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers); and

3.      All data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from each cellular telephone or device assigned to the Account, including, but not limited to, per call management data (PCMD) or Return Time from Tower (RTT) data.

US 054356

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by AT&T, and my official title is _____. I am a custodian of records for AT&T. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of AT&T, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity of **AT&T**; and

c.      such records were made by AT&T as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____          _____

Date                                              Signature

3

US 054357

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RECEIVED
OCT 30 2014
DOUGLAS E. ARPERT
U.S MAGISTRATE JUDGE

|  |  |
|---|---|
| IN RE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d) | Mag. No. 14-2528 (DEA) |

## ORDER

The United States has submitted an application pursuant to 18 U.S.C. § 2703(d), requesting that the Court issue an Order requiring AT&T, an electronic communications service provider and/or a remote computing service located in North Palm Beach, Florida, to disclose the records and other information described in Attachment A to this Order.

The Court finds that the United States has offered specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation.

IT IS THEREFORE ORDERED, pursuant to 18 U.S.C. § 2703(d), that AT&T shall, within ten days of the date of this Order, disclose to the United States the records and other information described in Attachment A to this Order.

Hon. Douglas E. Arpert
United States Magistrate Judge

Oct. 30, 2014
Date

US 054358

## ATTACHMENT A

**I.     The Account(s)**

The Order applies to certain records and information associated with the following four

(4) telephone numbers:

1. 917-696-9146

2. 917-929-3223

3. 347-263-1374

4. 310-666-1425

**II.     Records and Other Information to Be Disclosed**

AT&T is required to disclose the following records and other information, if available, to

the United States for each account or identifier listed in Part I of this Attachment ("Account"),

for the following five (5) time periods:

1. November 1, 2009 through December 3, 2009;

2. October 15, 2010 through October 20, 2010;

3. August 19, 2011 through August 24, 2011;

4. July 26, 2012 through July 31, 2012;

5. October 5, 2013 through October 10, 2013;

A.     The following information about the customers or subscribers of the Account:

    1.     Names (including subscriber names, user names, and screen names);

    2.     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    3.     Local and long distance telephone connection records;

    4.     Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    5.     Length of service (including start date) and types of service utilized;

US 054359

6. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"));

7. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

8. Means and source of payment for such service (including any credit card or bank account number) and billing records.

B. All records and other information (not including the contents of communications) relating to the Account, including:

1. Records of user activity for each connection made to or from the Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;

2. Information about each communication sent or received by the Account, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers); and

3. All data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from each cellular telephone or device assigned to the Account, including, but not limited to, per call management data (PCMD) or Return Time from Tower (RTT) data.

US 054360