**\*FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

```
_____ :
                              :
UNITED STATES OF AMERICA,     :
                              :     Cr. No. 14-287 (FLW)
                              :
              Plaintiff, :
                              :     OPINION
      v.                      :
                              :
MENDEL EPSTEIN, JAY           :
GOLDSTEIN, DAVID ARYEH        :
EPSTEIN, and                  :
BINYAMIN STIMLER,             :
                              :
              Defendants.:
_____ :
```

**WOLFSON**, **United States District Judge**:

Defendants Rabbi Mendel Epstein, Rabbi Jay Goldstein, David Epstein and Rabbi Binyamin Stimler (collectively, "Defendants"), have been charged with multiple kidnapping-related crimes allegedly involving coercive gets obtained from Jewish husbands in Orthodox Jewish divorce proceedings. Before and during trial, the Court has decided numerous evidentiary issues raised by Defendants. While those rulings have been placed on the record, the Court expands upon, in this written Opinion, issues concerning Defendants' religious-based defenses and arguments. Specifically, Defendants seek the dismissal of the Superseding Indictment on the basis that the Religious Freedom Restoration Act

("RFRA") forbids their prosecution.   In that connection, on similar grounds, Binyamin Stimler ("Stimler") had moved to sever his trial.   Alternatively, Defendants seek to introduce evidence of their Orthodox religious beliefs to negate their criminal intent and mount a consent defense to kidnapping.   The Government has opposed these m otions.   For the reasons set forth on the record, and for the reasons set forth in this Opinion, Defendants' motions are **DENIED.**

## BACKGROUND

On September 11, 2014, a grand jury in Trenton, New Jersey, returned a five-count Superseding Indictment against Binyamin Stimler, Mendel Epstein, Jay Goldstein ("Goldstein"), and David Aryeh Epstein.[1]   Defendants are all Orthodox Jewish men and their prosecutions arise out of allegations that Defendants engaged in criminal means to facilitate Orthodox Jewish divorces.

According to the Superseding Indictment, to effectuate an Orthodox Jewish divorce, a husband must provide his wife with a document known as a "get."   *See* Super. Ind. at ¶1(i). A get serves as documentary proof of the dissolution of a marriage under Jewish law, and a divorce cannot be effected

---

[1]   Two additional defendants were named in this indictment; however, for reasons not relevant to this Opinion, these defendants are not a part of the pending trial.

until a get is given by the husband.  The get is a dated and witnessed document wherein the husband expresses his intention to divorce his wife and sever all ties with her. The get is written by an expert scribe, known as a "sofer," who acts as the husband's agent.  After the get is written by the sofer, the husband hands it to his wife in the presence of two witnesses, who also sign the get.  A wife may also have an agent accept on her behalf.  Once the marriage is dissolved, a rabbinical court, known as a "beth din," will give both parties a certificate confirming their new marital status.  *Id.* at ¶ 1(i).

If a husband refuses to give his wife a get, the wife may sue for divorce in a beth din, which may order the husband to issue the get.  *Id.* If the husband does not comply, he may be subjected to various penalties to pressure him into consenting to the divorce.  *Id.* A woman whose husband will not give her a get is known as an "agunah" ("agunot" in plural), a chained woman who cannot remarry. *Id.*

Count I of the Superseding Indictment charges all Defendants with conspiracy to commit kidnapping. The object of this conspiracy was to obtain money from the agunot and to threaten and coerce Jewish husbands to give their wives gets, i.e., kidnappings.  *Id.* at ¶ 3. The remaining four

3

Counts charge the various Defendants with three kidnappings and one attempted kidnapping; the conduct alleged in these substantive counts are also alleged in Count I as part of the overt acts in the conspiracy charge.[2]

Several of the defendants' arrests stemmed from a "sting" operation[3] in which two undercover FBI agents posed as an agunah and her brother. *Id.* at ¶ 7(d). In summary, the Indictment alleges that Mendel Epstein charged the undercover agents approximately $10,000 for Mendel Epstein to arrange for the kidnapping and beating of the fictitious husband in order to coerce him to give a get. *Id.* at ¶ 7(i). The undercover agents wired Mendel Epstein an additional $20,000 on October 2, 2013, and the agents were instructed to pay the final $30,000 at the time of the fictitious kidnapping. *Id.* at ¶ 7(u). Ultimately, Defendants Stimler and Goldstein were arrested at the scene of the purported kidnapping.

The Superseding Indictment further asserts three actual kidnappings, wherein the various defendants are accused of

---

[2]  Specifically, Count 2 charges David Epstein with a 2009 kidnapping; Count 3 charges Mendel Epstein, David Epstein, and Goldstein with a 2010 kidnapping; Count 4 charges Goldstein, David Epstein, and Stimler with a 2011 kidnapping; and Count 5 charges Mendel Epstein, Goldstein, and Stimler with an attempted kidnapping in 2013.

[3]  The events of the sting operation are also the basis for the substantive attempted kidnapping charge in Count 5.

4

acting with others to kidnap Jewish men and coerce them to agree to give their wives gets. *See Id.* at ¶ 7(a) to ¶ 7(c). As part of these kidnappings, Defendants are accused of tying up and beating the victim-husbands.[4] *Id.*

**DISCUSSION**

### I.   RFRA

Stimler, joined by his co-defendants, moves to dismiss the Superseding Indictment under Fed. R. Crim. P. 12(b) on the basis that Defendants' criminal prosecution would violate RFRA. Indeed, the Act requires that the Government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless "the application of the burden to the person -- (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-1(a) to 1(b); *Holt v. Hobbs*, 135 S. Ct. 853, 860 (2015). Furthermore, "[a] person whose religious exercise has been burdened in violation of this section may assert

---

[4]   In his Motion, Stimler claims that prior to the events of the "sting," Stimler had acted as a witness in Jewish divorces, wherein husbands willingly authorized the get. Stimler Br. at 4. In that regard, according to Stimler, he was asked to accompany certain individuals to New Jersey on the date of the sting operation to act as a witness. *Id.* Stimler asserts that he did not participate in, nor did he have any knowledge of, any violence or kidnapping in connection with the get proceeding. *Id.* at 5.

that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." *Id.* at § 2000bb-1(c).

Invoking RFRA, Defendants insist that their prosecution substantially burdens their Orthodox religious beliefs, and that even if the Government has a compelling interest, the prosecution of Defendants is not the least restrictive means of furthering that interest. Stimler argues, in the alternative, that his prosecution, separate and apart from the other three defendants, violates RFRA.[5] Simply put, it is Defendants' position that an exception to the kidnapping statutes exists because the alleged kidnappings were done in furtherance of sincerely held religious beliefs. That position is not sustainable.

For one, I conclude that the Government's decision to prosecute Defendants does not constitute a substantial burden on Defendants' religious exercise. Further, even if a substantial burden does exist, I find that the Government has a compelling interest in preventing crimes of violence,

---

[5]  Stimler additionally claims that a criminal prosecution which violates RFRA should be terminated before trial. Stimler Br. at 5. This point is not disputed by the Government. The Court denied this motion on the record prior to the beginning of trial, on January 28, 2015, reserving the right to file a later opinion. Stimler renewed the motion on February 17, 2015, after the jury had been selected and one day before opening arguments.

and moreover, the arrest and prosecution of individuals who violate such criminal laws is the least restrictive means of enforcing that interest.

### 1.    Substantial Burden on Religion

Stimler argues that prosecution of the defendants in this case substantially burdens the exercise of their religion. Stimler Br. at 7.   In support of that position, Stimler offers the expert declaration of Rabbi Yitzchok Breitowitz, who states that it is a "mitzvah" -- that is, a religious commandment -- to serve as a witness to a get, and to assist an agunah in obtaining a get. Stimler Br. at 9-10, Breitowitz Decl. at ¶¶ 13, 14, 16. On January 28, 2015, this Court ruled on the record that Stimler had not shown a substantial burden on his religious practice, because there was no evidence that his religion required the use of force. Following this ruling, Stimler submitted a Supplementary Declaration of Rabbi Breitowitz, which states that Jewish law authorizes "certain forms of force," and that freeing an agunah "is a 'mitzvah' even if force is necessary to secure the husband's expression of consent." Breitowitz Supp. Decl. at ¶ 6. The Government, responding to the Supplemental Declaration, asserts that even if Jewish law permits the use

of violence to obtain a get,[6] it does not condone the use of violence in exchange for money.[7] Gov't Renewed Br. at 7–8.

"Whether a burden is 'substantial' under RFRA is a question of law, not a question of fact." *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, ___ F.3d ___, ___ No. 13-3536, 2015 WL 543067, at *13 (3d Cir. Feb. 11, 2015). In a case like this, a substantial burden exists where "'the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.'" *Id.* (quoting *Washington v. Klem,* 497 F.3d 272, 280 (3d Cir. 2007)). Conversely, there is no substantial burden "if the government action does not coerce the individuals to violate their religious beliefs or deny them 'the rights, benefits, and privileges enjoyed by other citizens.'" *Id.* (quoting *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988)). While the definition is expansive, the test does not mean that "*any* incidental effect of a government program which may have *some* tendency to coerce individuals into acting contrary to

---

[6]   The Government has conceded that that under certain Jewish authority, "coercive" acts includes violent and non-violent means.   *See* Transcript, February 19, 2015, T45:10-15.

[7]   I note that Stimler contends that as a witness, he did not receive any money for his actions.   *See infra*, pp. 24-25.

their religious beliefs satisfies the substantial burden standard." *Klem*, 497 F.3d at 279. Importantly, not every burden is substantial; "RFRA's reference to 'substantial' burdens expressly calls for a qualitative assessment of the burden that the accommodation imposes on the . . . exercise of religion." *Geneva Coll.*, __ F.3d at __, at *13.

One way to qualitatively assess the burden that a government practice places on religious exercise is to consider whether an adherent has acceptable alternative means to practice his religion. For example, in *Klem*,[8] an inmate argued that his religion required that he read four books a day, and that the Pennsylvania Department of Corrections' ("DOC") policy which only permitted the inmate to keep ten books in his cell at one time constituted a substantial burden on his religious exercise. *Id.* at 275. While the Third Circuit agreed with the inmate's position, *Id.* at 282, the Circuit, nonetheless, queried whether alternatives presented by the DOC -- that the inmate could read books in the library or trade books – sufficiently allowed the inmate to exercise his religious requirements. *Id.* The court held that these alternatives were

---

[8] Although the Third Circuit, in *Klem*, analyzed the definition of "substantial burden" in the context of the Religious Land Use and Institutionalized Persons Act of 2000, this test has been used interchangeably in the RFRA context. *See Geneva Coll.*, __ F.3d at __, at *13.

insufficient: the inmate could only go to the library once a week and could only take out four books each time, and the record did not show that the inmate was permitted to trade books within the prison. *Id.* Thus, absent any meaningful alternatives, the prison practice was a substantial burden on the inmate's religious exercise. *See Cheffer v. Reno*, 55 F.3d 1517, 1522 (11th Cir. 1995) (no substantial burden when religion did not require particular means of expressing religious view and alternative means of religious expression were available); *Weir v. Nix*, 114 F.3d 817 (8th Cir. 1997) (considering alternatives in determining whether burden was "substantial"); *Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001)(finding that there is no "substantial burden" where alternatives were available); *see, e.g., Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813–14 (8th Cir. 2008) (finding that BOP's refusal to provide halal meat meals did not constitute a substantial burden on inmate's religion where inmate had not "exhausted alternative means of accommodating his religious dietary needs"); *Watkins v. Shabazz*, 180 F. App'x 773, 775 (9th Cir. 2006)(holding that there was no substantial burden because defendants gave the inmate two alternatives--eating the nutritionally adequate

meat-substitute meals or finding an outside organization to provide halal meat).[9]

Here, Defendants are accused of conspiracy to commit kidnapping and kidnapping, and the underlying factual allegations include acts of violence. These acts were done, according to Defendants, in pursuit of a valid religious objective: obtaining a get for an agunah. According to Rabbi Breitowitz, an individual "would be performing a 'mitzvah' if he joined an effort to secure consent to the writing of a *get* from a recalcitrant husband even if he anticipated that . . . physical coercion would be needed to overcome the husband's persistence in refusing to authorize a *get*." Supp. Breitowitz Decl. at ¶ 10.

There is no dispute that facilitating an agunah to obtain a get is part of Defendants' religious exercise. And, while there is considerable debate in the Jewish community regarding the use of force in obtaining a get, I nonetheless accept for the purposes of this Opinion that Jewish law permits the use of violence or force to obtain a get from a recalcitrant husband.  However, there is also no

---

[9] It is worth mentioning that, though not applicable to the case at hand, the test to determine the validity of a prison regulation which impinges on prisoners' constitutional rights includes as one factor "whether inmates retain alternative means of exercising the circumscribed right." *DeHart v. Horn*, 290 F.3d 262, 269 (3d Cir. 2004); *see Turner v. Safley*, 482 U.S. 78, 90 (1987).

dispute that there are alternative means of coercion to perform this mitzvah. For example, Rabbi Breitowitz notes that in the state of Israel, non-violent means are used by the government to obtain gets, namely jailing the husband or prohibiting their exit from the country. Breitowitz Decl. at ¶ 16. Even in this country, as noted by Rabbi Breitowitz, the State of New York has enacted laws to penalize husbands who impose "a barrier to remarriage." Supp. Breitowitz Decl. at ¶ 3, N.Y. Dom. Rel. Law. §§ 253, 236B. While there may not be secular laws in other states in this regard, according to Rabbi Breitowitz, the names of husbands who refuse to authorize a get can be published in *The Jewish Press* "so that the reading public will hold them in disrepute." Breitowitz Supp. Decl. at ¶ 3. This is but only one example of a means used to shun and embarrass a recalcitrant husband. In sum, these examples all indicate that while freeing an agunah is a mitzvah, Jewish law provides alternatives to kidnapping or violence to do so. These alternative and meaningful means of obtaining a get – *e.g.*, public shaming or utilizing the secular law -- do not violate the criminal laws of the United States, yet still permit Orthodox Jews to participate in the mitzvah of freeing agunot.

On the face of the Indictment, it is unclear whether all non-violent methods were exhausted before the alleged kidnappings took place here. That fact, however, does not change this Court's analysis. Indeed, if Defendants had acceptable religious alternatives -- instead of resorting to violating the criminal laws -- I find that the Government's application of the kidnapping laws to Defendants here does not substantially      Defendants' religious exercise. Nevertheless, even if Defendants had exhausted all other available non-violent means of coercing a husband to give his wife a get, and the only remaining method of coercion, as argued by Defendants, is through violence or force, i.e., kidnapping, I remain convinced that would not amount to a substantial burden.  This Court has not found any authority condoning the use of violence under the guise of religion, and more importantly, no case has found the Government's application of violent crime laws to certain religious practices is a substantial burden.

### 2.   Compelling Interest

Even assuming Defendants could prove a substantial burden on their religion as a result of their prosecution, the RFRA challenge fails under the remaining two prongs of the test.   As to the first of the two elements, the Government has the burden of demonstrating that the law

13

which constitutes a substantial burden on an individual's religion furthers a compelling governmental interest. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). On this issue, Stimler posits that "deterrence of possible future efforts to use violent means to coerce recalcitrant husbands to authorize the writing of a 'get'" is not a compelling interest. Stimler Br. at 11. To contrary, the Government maintains that prosecuting crimes of violence is compelling. Gov't Br. at 16.

When determining whether a government action serves a compelling interest, it is not sufficient to use broad terms; RFRA "contemplates a more focused inquiry." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014). Thus, even if the government can show that the law is in furtherance of a generalized compelling interest, the government must prove that "the compelling interest is satisfied through application of the law 'to the Person' — the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita*, 546 U.S. 418, 430–31 (2006). For example, in *Yoder*, the Supreme Court found that "Wisconsin's interest in compelling the school attendance of Amish children to age 16 emerges as somewhat less [compelling] than requiring such attendance for children generally." *Wisconsin v. Yoder*, 406

14

U.S. 205, 228–29 (1972). The Court reasoned that while "compulsory education for a year or two beyond the eighth grade may be necessary when its goal is the preparation of the child for life in modern society as the majority live," the same did not apply "if the goal of education be viewed as the preparation of the child for life in the separated agrarian community that is the keystone of the Amish faith." *Id.* at 222. Thus, the Supreme Court advised that in finding a compelling interest, the determination must be tailored specifically to the group of religious adherents. In that regard, the "to the person" analysis, here, applies to the group of defendants in this case as adherents to Orthodox Judaism, not merely as to the general public. With that in mind, I will turn to Defendants' arguments.

To begin, Stimler argues that the Supreme Court's decision in *O Centro* and its line of cases support a finding that the Government's application of the kidnapping-related statutes to Defendant's conduct is not a compelling interest. Stimler reasons that *O Centro* stands for the broad legal proposition that criminal prosecution of individuals who are engaged in performance of their religiously mandated duties is not a governmental compelling interest. I disagree.

15

In *O Centro*, the Supreme Court upheld a district court's decision holding that RFRA protected the use of hoasca, a Schedule 1 drug, by a religious organization, O Centro Espirita Beneficiente Uniao do Vegetal ("UDV"). The Court agreed that the government had not shown that "health or diversion concerns provide a compelling interest in banning UDV's sacramental use of *hoasca*," and that the government "has not offered evidence demonstrating that granting the UDV an exemption would cause the kind of administrative harm recognized as a compelling interest." 546 U.S. at 436. The Supreme Court acknowledged that "Schedule I substances such as DMT are exceptionally dangerous," but stated that "[t]he question of the harms from the sacramental use of hoasca by the UDV was litigated below. [T]he District Court found that the Government had not carried its burden of showing a compelling interest in preventing such harms", *id.* at 432, despite the parties, in the district court, having presented extensive evidence on the dangerousness of hoasca, specifically in the context of religious use. *O Centro Espirita v. Ashcroft*, 282 F. Supp. 2d 1236, 1255-62 (D.N.M. 2002) (describing evidence which included: study which "compared fifteen long-term members of the UDV, who had drunk hoasca for several years, with fifteen control subjects who had never used hoasca";

16

observations of researchers that "the UDV had constructed a ceremonial structure for their ritual use of hoasca that optimized safety and minimized the likelihood of adverse consequences"; and "the attention that UDV leadership has paid to the danger of adverse drug interactions."). The Supreme Court additionally rejected the argument that "the Controlled Substances Act establishes a closed regulatory system that admits of no exceptions under RFRA," finding that the long-standing exception to the law for the religious use of peyote fatally undermined the claim. *Id*. at 434–35.

The facts in *O Centro* are wholly different from the circumstances in this case. While the *O Centro* Court was concerned with the religious participants' right to use controlled substances for their own use, in this case, Defendants' purported use of force to effectuate a mitzvah involves kidnapping and even physical violence to others. Even more compelling, the Supreme Court in *O Centro* found that there was little evidence to demonstrate the type of harm to the religious personal drug users that the government there proffered. Thus, the Court found that the government's stated interest to protect the health of those religious users was not a compelling one. To the contrary, the Government's interest, here, is to protect the health

17

and safety of those individuals who were victims of Defendants' alleged violence and kidnapping. Accordingly, I find *O Centro* distinguishable.

Importantly, however, the Supreme Court advised, in *O Centro,* that "there may be instances in which a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA." *Id.* at 437. Indeed, prior case law has recognized a need for uniform enforcement of a particular category of law. For example, in denying a challenge by the Amish to the requirements that they pay Social Security taxes, the Supreme Court found that "the Government's interest in assuring mandatory and continuous participation in and contribution to the social security system is very high," and that "it would be difficult to accommodate the comprehensive social security system with myriad exceptions flowing from a wide variety of religious beliefs." *United States v. Lee*, 455 U.S. 252, 258-59, 260 (1982); *see Adams v. C.I.R.*, 170 F.3d 173, 178 (3d Cir. 1999) ("uniform, mandatory participation in the Federal income tax system, irrespective of religious belief, is a compelling governmental interest. . . . As a result, requiring petitioner's participation in the Federal income tax system is the only, and thus the least restrictive, means of furthering the Government's interest."). Thus,

18

"the Government can demonstrate a compelling interest in uniform application of a particular program by offering evidence that granting the requested religious accommodations would seriously compromise its ability to administer the program." *O Centro*, 546 U.S. at 435.

Here, in the specific context of violent crimes, the Government unquestionably has a compelling interest in uniformly applying kidnapping laws to prevent serious crimes of violence.[10]   It is beyond cavil that "the duty to prosecute persons who commit serious crimes is part and parcel of the government's "paramount responsibility for the general safety and welfare of all its citizens." *In re Grand Jury Empaneling of Special Grand Jury*, 171 F.3d 826, 832 (3d Cir. 1999); *Schall v. Martin*, 467 U.S. 253, 264 (U.S. 1984) ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted.").

Because of such a paramount objective, the First Amendment's protection of religious exercise does not typically extend to violent acts. *See American Life League v. Reno*, 47 F.3d 642, 656 (4th Cir. 1995) ("we do not think the Free Exercise Clause shields conduct violating a criminal law that protects people and property from physical

---

[10]   The Supreme Court has categorized kidnapping as a crime of violence.   *See*, *e.g.*, *United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 (1999).

19

harm"); *United States v. Mullet*, 868 F. Supp. 2d 618, 624 (S.D. Ohio 2012) ("violence is not a protected form of religious exercise"); *see also Chatwin v. United States*, 325 U.S. 455, 460 (1946) ("bona fide religious beliefs cannot absolve one from liability under the Federal Kidnapping Act."); *Davis v. Beason*, 133 U.S. 333, 345 (1890), *abrogated by Romer v. Evans*, 517 U.S. 620 (1996) ("Crime is not the less odious because sanctioned by what any particular sect may designate as 'religion.'"); *Reynolds v. United States*, 98 U.S. 145, 166 (1878) (asking rhetorically if "one believed that human sacrifices were a necessary part of religious worship," whether the government could interfere with a human sacrifice).

In that regard, the laws prohibiting kidnapping and conspiracy to commit crimes are laws for which the need for uniform enforcement precludes the recognition of religious exception in this case. Indeed, I have been unable to find a single case where RFRA has been used as a successful defense against prosecution for crimes involving force or violence. *Cf. Mullet*, 868 F. Supp. 2d at 624 (holding that Hate Crimes Prevention Act does not violate RFRA); *United States v. Brock*, 863 F. Supp. 851, 866 (E.D. Wisc. 1994) (holding that the Freedom of Access to Clinic Entrances law does not violate RFRA because "FACE addresses governmental interests

20

in preventing violence"). The Government has therefore shown a compelling interest in the uniform application of the kidnapping and conspiracy laws, and no exception can be made for Defendants in this case.

### C. Least Restrictive Means

Stimler asserts that even if the Government has a compelling interest in preventing violent means to coerce a husband into providing a get, "it would surely have been possible to achieve such deterrence by less restrictive means than this 'sting' and subsequent prosecution." Stimler Br. at 11. Stimler suggests that the United States Attorney for the District of New Jersey, or the Eastern or Southern Districts of New York, could have deterred this conduct by "issu[ing] public statements warning that anyone who used force or attempted to use force to coerce a 'get' would be prosecuted in a federal criminal prosecution." *Id.* The Court disagrees.

The least-restrictive-means standard requires a showing that the government "lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Burwell v. Hobby Lobby Stores, Inc.* 134 S. Ct. 2751, 2780 (2014). As stated above, the Government has a compelling interest in the uniform prevention of violence. Stimler has argued, as

discussed *supra*, that the law burdens the "mitzvah" of using force, if necessary, to obtain a get; thus, there is no method by which the Government could enforce its interest in preventing violence without burdening Defendants' religious exercise. In that regard, in this case, any effective means to prevent violence would necessarily prevent Defendants from using the force, which, according to Defendants, is permitted by Orthodox Judaism.

I do not find that there are other effective means than prosecuting those who commit a crime of violence, such as kidnapping, to enforce the Government's compelling interest. Stimler's suggestion that the Government could have issued a warning cannot be taken seriously. First, the claim that RFRA requires the government "to engage in affirmative outreach" was rejected by the Tenth Circuit in *United States v. Friday*, 525 F.3d 938, 956–58 (10th Cir. 2008). In that case, the defendant, a Native American, shot a bald eagle to use in a religious ceremony, and was charged with a violation of the Bald and Golden Eagle Protection Act. *Id.* at 942. The defendant had not applied for a permit to take an eagle. *Id.* at 950. The defendant argued that RFRA required the government "to engage in affirmative outreach to ensure that tribes are aware of the permitting process," and that in the absence of such outreach, "the process is

22

more restrictive than necessary." *Id.* at 956–57. The circuit panel noted that the permit process "is not a secret" and that the defendant had "at least as much notice as is given to the average criminal defendant subject to the legal fiction that everyone is presumed to know the law." *Id.* at 957 (internal quotation marks, citation, and alteration omitted). The court then held that the government did not have the obligation to engage in outreach, stating "We are aware of no case under RFRA, or under the Free Exercise Clause prior to the enactment of RFRA, in which the government was held to have violated free exercise rights because the affected religious adherent was unaware of the availability of an accommodation." *Id.* The defendant, according to the Tenth Circuit, was not requesting the government to lift a restriction, but was demanding affirmative government assistance, which is "generally disfavored in free exercise cases." *Id.*

The conclusion that RFRA does not require the government to reach out to religious groups applies with even greater force here, where the issue is not Defendants' failure to take advantage of a religious accommodation, but the application of a neutral criminal law of general application. As aptly noted by the Tenth Circuit, "'[e]very one is presumed to know the law.'" *Id.* (quoting *United*

*States v. Hodson*, 77 U.S. (10 Wall.) 395, 409 (1870)); *see also Cheek v. United States*, 498 U.S. 192, 199 (1991) ("The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system."). Tellingly, Defendants have not suggested that they were unaware that their actions were illegal, so it is unclear how such a warning would have been an effective deterrent. *See, e.g.*, *U.S. v. Edward*, 446 Fed. Appx. 44, 46 (9th Cir. 2011)("[a]pplying the criminal laws prohibiting possession and manufacture of marijuana to Lepp is the least restrictive means of furthering the government's compelling interest in preventing diversion of sacramental marijuana to non- religious users."). Because the Government has demonstrated a compelling interest in preventing violent crimes, and because there is no less restrictive means available to the Government which would not impose a burden on Defendants' religious exercise, RFRA does not provide a defense to Defendants in this case.

**D. RFRA As Applied to Stimler**

In addition to the arguments above, Stimler argues that his prosecution, in particular, violates RFRA. Stimler Br. at 11–13. According to the brief, by solely acting as a witness of the get proceedings, the Government has "no evidence [whatsoever] that [Stimler] participated in—or had

24

any knowledge of—potential violence to be committed by anyone else." *Id.* at 11. Further, Stimler was "paid nothing and promised nothing for performing this religiously mandated act." *Id.* at 11–12. Stimler asserts that he "cannot be held legally accountable for the allegedly criminal objectives of others in whose company he was in on October 9, 2013." *Id* at 12. Stimler argues further that the "governmental duty under RFRA, as interpreted and applied in the *O Centro* case, is to make a 'more focused' evaluation of the impact of governmental conduct 'to the person.'" *Id.* at 13.

In essence, Stimler maintains that if the evidence against him is weak, RFRA requires this Court to dismiss the case because his prosecution and trial impose a burden on his religious exercise. In that regard, Stimler, essentially, asks this Court to weigh the Government's evidence against him. Stimler's arguments are contrary to well-established law.

On a motion to dismiss, a court reviews the indictment to determine whether it:

(1) contains the elements of the offenses intended to be charged,

(2) sufficiently apprised the defendant of what he must be prepared to meet, and

(3) allows the defendant to show with accuracy to what

25

extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.

*United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007).

All facts alleged in the indictment must be taken as true, and the court is to employ a "common sense construction" thereof. United States v. Hodge, 211 F.3d 74, 76 (3d Cir. 2000). Indeed, "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *United States v. Bergin*, 650 F.3d 257, 264 (3d Cir. 2011)(quoting *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989)). This is a "narrow, limited analysis geared only towards ensuring that legally deficient charges do not go to a jury." *Id.* at 268. In that regard, the Third Circuit made clear that, although an indictment fails to state an offense if the facts alleged fall below the scope of the criminal statute "as a matter of statutory interpretation," *id.* at 264-65, no deeper inquiry into the veracity or evidentiary value of the indictment's allegations is permitted. In other words, a ruling on a motion to dismiss is not "a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660-61 (3d Cir.

2000) (citations omitted). Hence, "[e]videntiary questions"—such as credibility determinations and the weighing of proof—"should not be determined at th[is] stage." *United States v. Gallagher*, 602 F.2d 1139, 1142 (3d Cir. 1979).

Here, I do not find that RFRA requires this Court to act as the finder of fact and examine the sufficiency of the Government's evidence against Stimler. *See United States v. Huet*, 665 F.3d 588, 597 (3d Cir. 2012) (overruling district court's dismissal of indictment because "case does not involve a question of whether the facts alleged in the indictment fall beyond the scope of the relevant criminal statute as a matter of statutory interpretation" but rather "the District Court's determination that the Indictment failed to state an offense was based solely on its assessment of the strength of the Government's case."). In fact, Stimler's position requires this Court to hold a mini-trial on the merits, in contravention of Fed. R. Crim. P. 12(b)(1). In that connection, Stimler is asking this Court, pretrial, to accept the fact that he functioned solely as a witness for the get, and that he had no involvement in the planning of the get, including the kidnapping, did not participate in the kidnapping, and was not aware that others would, or did, use violence against the victim-husbands. If, however, the facts as stated in the Superseding

27

Indictment are proven at trial, Stimler is not entitled to use RFRA as a defense, for the reasons that have already been delineated above.

Similarly, I do not find helpful the cases cited by Stimler to support his proposition that he should not be subjected to prosecution; those cases involve standards that a jury must apply, and do not reference RFRA considerations. *See United States v. Caballo-Rodriguez*, 726 F.3d 418, 433 (3d. Cir. 2013) ("the *jury* could have reasonably concluded that Caraballo-Rodriguez knew that he was involved in an illegal venture" (emphasis added)); *United States v. Korey*, 472 F.3d 89, 93 (3d Cir. 2007) (vacating conviction because "[t]he jury instructions . . . did not require the jury to find a unity of purpose.").

Next, Stimler argues that the "least restrictive means" prong of RFRA entitles Stimler to be severed from the remaining defendants. Stimler Brief at 14. This argument is a novel one. The RFRA statute states that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding." 42 U.S.C. § 2000bb-1(c). There is nothing in the statute which suggests that it can be used to argue for severance.

28

Moreover, the burdens that Stimler suggests a joint trial places on him are not burdens on his religious exercise. According to Stimler, he has "ceased performing the 'mitzvah' of serving as a witness in Jewish divorces even when the husband is willing and eager to divorce," that the arrest has "seriously crippled" his livelihood, and a lengthy trial "will impoverish him." Stimler Br. at 13. I do not find these arguments convincing. The Government is not prosecuting Stimler for serving as a witness to a Jewish divorce, but for participating in a conspiracy to kidnap. If a Jewish divorce does not involve kidnapping, or use of physical force that would potentially violate criminal laws, there is nothing preventing Stimler from acting as a witness in Jewish divorces pending his criminal trial. In addition, the Court acknowledges that a lengthy trial may generally place enormous burdens on defendants. These burdens, however, are not religious burdens. An arrest and prosecution may impact a defendant's employment, regardless of his occupation; the fact that a defendant's livelihood is based in his religion does not make the consequences of trial a burden on his religious exercise.

Finally, Stimler questions the validity of his prosecution. In that regard, Stimler maintains that because the Government had acknowledged that there is a great deal

of debate on the issue whether the defendants were simply obeying the beth din's contempt orders to effectuate the get by "beating" the victims, it is constitutionally impermissible for the Government to prosecute the defendants based on the Government's own interpretation of Jewish law, i.e., that coercion under Jewish law does not include violence. This argument is misplaced. Defendants were not indicted on the basis of their religious beliefs or the Government's interpretation of Defendants' religious beliefs. Defendants were indicted based on their alleged conduct of conspiracy to commit kidnapping and kidnapping. Put differently, even if the Defendants were acting on a valid religious order to forcibly effectuate the get, that religious purpose does not negate the fact that they allegedly used force to restrain the victims and physically removed them against their will. It is this alleged conduct with which these Defendants are charged, and the Government must prove each element of the crimes. Defendants are not on trial based on, or because of, the sincerity of their religious beliefs.

Thus, RFRA, when applied to Stimler, does not require either dismissal of the indictment or for Stimler's trial to be severed from his co-defendants.

**E. Use of a Sting Operation**

Stimler argues that "criminal prosecution of individuals such as the defendants in this case who were engaged in performance of this religiously mandated duty [obtaining a get for an agunah] obviously burdens exercise of the religious observance," because Defendants will be "subjected to the severe burden of a lengthy public jury trial," Defendants "may be imprisoned for long terms," and because the prosecution will have an "*in terrorem* effect on other Orthodox Jews who may seek to participate in the future in performance of the 'mitzvah' of liberating an 'agunah.'" Stimler Br. at 10. Stimler further argues that, as a result, the prosecution may not proceed unless the Government can show that:

> creating a "sting" operation involving no real "agunah" and no real recalcitrant husband and invoking the federal kidnapping statute against Orthodox rabbis and other individuals who agree to participate in the religiously commendable effort to free an "agunah" furthers a compelling government interest and is the least restrictive means of achieving that interest."

Stimler Br. at 10.

It is possible for a plaintiff to assert a RFRA claim against the government for the use of investigatory tactics which substantially burden religious exercise. *See, e.g.*, *In re Grand Jury*, 171 F.3d 826 (appeal from contempt order, asserting that Orthodox Judaism prohibited witnesses from testifying against father before grand jury); *Mockaitis v.*

31

*Harcleroad*, 104 F.3d 1522 (9th Cir. 1997), *overturned on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997) (suit brought under 18 U.S.C. § 1983 asserting, *inter alia*, violation of First Amendment and RFRA where District Attorney obtained recording of confession to Catholic priest for use in criminal investigation). However, the argument presented here is not that the sting operation, on its own, violated RFRA. Indeed, Stimler has not submitted any evidence demonstrating that the sting operation -- independent of the arrests and prosecution which followed -- constituted a substantial burden on his religious exercise.

Even if Stimler had made such a claim, it would fail. While the Third Circuit has not held that "the government's interest in investigating and prosecuting crime is *always* compelling under RFRA," it has found a compelling interest in investigating a serious crime which did ***not*** involve violence or a threat to public safety. *In re Grand Jury*, 171 F.3d at 832 (emphasis added). Therefore, based upon the Third Circuit's reasoning, it is logical to find that the interest in investigating a crime is more compelling where the crime in question involves violence. Moreover, while Stimler emphasizes that the sting operation "involv[ed] no real 'agunah' and no real recalcitrant husband," the sting operation was in response to an alleged ongoing conspiracy

32

to kidnap, and was created in response to multiple incidents which allegedly involved the actual kidnappings of recalcitrant husbands. The Government's compelling interest in preventing the violent crime of kidnapping is not reduced simply because the final overt action of the alleged conspiracy did not result in actual violence. Nor does the lack of violence change the fact that the sting operation furthered the Government's interest, by providing the Government with clear evidence of the conspiracy.

Accordingly, I find that the Government, here, had a compelling interest -- even if, arguendo, the sting operation substantially burdened Defendants' religious exercise -- in investigating the crimes of conspiracy and kidnapping which are alleged in the Superseding Indictment, and that the sting operation furthered that interest.

The next question, therefore, is whether the sting operation constituted the least restrictive means of enforcing the Government's interest. Stimler has not suggested any other means that the Government should have employed in furthering its compelling interest. It is, of course, always possible for the Government to use less aggressive means to investigate a crime. However, as discussed *supra*, the least-restrictive-means standard focuses on whether the government could achieve its goal

with less restriction "*on the exercise of religion* by the objecting parties," *Burwell*, 134 S. Ct. at 2780 (emphasis added). Because the sting operation did not burden any religious exercise, I find that the sting operation is the least restrictive means of enforcing the Government's compelling interest. Hence, any claim that the sting operation violated RFRA on its own would fail.

Stimler further argues that the sting operation, though not a burden on its own, violated RFRA because Defendants' arrests and prosecution as a result of the sting, burdened their religious exercise. This argument is easily disposed of. Initially, it is far from clear whether the Government must justify its methods of investigation when a defendant asserts a RFRA defense to a prosecution. Regardless, I have already found that the Government did not burden Defendants' religion during its prosecution and arrest of Defendants. And, I have found that the ways in which the Government investigated Defendants' alleged criminal activities, i.e., a sting operation, did not violate Defendants' religious beliefs. Because both aspects of Stimler's argument have been found not violative of RFRA, his last ditch effort to mount a RFRA defense is simply without merit. In sum, the Government's use of a sting operation in connection with Defendants' prosecution and arrests, does not change my

34

conclusion that a RFRA defense is not available to Defendants in this case.


## II.    Evidentiary Issues

In addition to their legal defense pursuant to RFRA, Defendants, particularly Stimler, Mendel Epstein and Goldstein, intend to introduce their religious beliefs to negate the element of intent as to the conspiracy and kidnapping charges.  As a part of this defense, Defendants concede that even if religious law does not trump secular criminal law,[11] their sincerely held religious beliefs undermine one or more elements of the specific intent required to find them guilty of conspiracy to commit kidnapping, attempted kidnapping and kidnapping.  Their theory rests on Defendants' belief that coercive actions taken against the victims in this case were necessary to effectuate Jewish law.  In that connection, Defendants also maintain that the victims consented to the alleged kidnappings by virtue of their signing of the Orthodox marriage ketubah, a document recording the financial obligations which the husband undertakes toward his wife in

---

[11] Any argument regarding a religious exception has been addressed in the first section of this Opinion relating to the RFRA.

respect of, and consequent to, their marriage, obligations which in principle are imposed on him by law. According to Defendants, by signing the ketubah, an Orthodox Jewish husband promises to be bound by the laws of Moses and Israel, both to the authority of the beth din and to the halakhic, or the Jewish religious law, process of the "forced" get as the term is described by Maimonides.[12] Therefore, taken together, Defendants insist that because of their religious beliefs and because of their beliefs that the victims have consented to the coercive acts, i.e., kidnapping, Defendants lack the intent to commit the crimes as charged.  The Court rejects this theory of defense.

Defendants are charged with kidnapping, attempted kidnapping and conspiracy to commit kidnapping.  As to the conspiracy charge, the Government must prove the following elements: (1) a shared unity of purpose; (2) an intent to achieve a common illegal goal of kidnapping; and (3) an agreement to work toward that goal. *See United States v. John-Baptiste*, 747 F.3d 186, 204-05 (3d Cir. 2014).  With respect to the substantive crime of kidnaping, the Government must prove that (1) the defendant knowingly and

---

[12] The Court takes judicial notice that Maimonides was an influential figure in the Jewish religion, who has had a profound impact on Jewish law, philosophy, and religious consciousness.

36

willfully kidnapped, abducted, seized, or confined another
person; (2) for ransom, reward, or other benefit; and (3)
traveled in interstate commerce or willfully used an
instrumentality of commerce. *See* 18 U.S.C. § 1201(a) *United
States v. Brika*, 487 F.3d 450, 456 (6th Cir. 2007); *United
States v. Dixon*, 592 F.2d 329, 340 (6th Cir. 1979). As for
the attempt crime, the Government must also prove that the
defendants took a substantial step to commit the crime of
kidnapping. *See United States v. Resendiz-Ponce*, 549 U.S.
102, 108 n.3 (2007). In that regard, it is necessary that
Defendants had the requisite intent to commit the underlying
act. *Id.* Importantly, these crimes are specific intent
crimes. *See United States v. Maynard*, 2015 U.S. App. LEXIS
227, at *2 (3d Cir. Jan. 7, 2015)(conspiracy is a specific
intent crime); *United States v. Weir*, 587 Fed. Appx. 300,
306 (3d Cir. 2014) (kidnapping is a specific intent crime);
*United States v. Pavulak*, 700 F.3d 651, 669 (3d Cir. 2012)
(attempt crime requires specific intent).

Here, Defendants argue that they are entitled to
introduce evidence of Jewish law, in the context of
obtaining a valid get, and their religious beliefs, to
establish that they did not possess the specific intent to
commit any of the crimes. Instead, according to their
defense, Defendants were motivated by their religion to

37

commit certain "acts."  In support of their position, Defendants rely on the decisions in *United States v. Hsia*, 24 F.Supp. 2d 33 (D.D.C. 1998), *United States v. Martines*, 903 F.Supp. 2d 1061 (D. Hawaii 2012), and *United States v. Bertram*, 477 F.2d 1329 (10th Cir. 1973).  However, based on the facts of the present case, these out-of-circuit cases do not lend support to Defendants' position.  I address each in turn.

In *Hsia*, a six-count indictment charged Maria Hsia with various offenses deriving from a scheme to solicit illegal political contributions and disguise them as lawful ones. *United States v. Hsia*, 176 F.3d 517, 520 (D.C. Cir. 1999). The indictment alleged a series of actions taken by Hisa and her co-conspirators to funnel money from a tax-exempt Buddhist organization (the "Temple") through straw contributors into various campaigns.  Specifically, the government accused Hsia of directing monks and nuns from the Temple to write checks to political committees for which they were reimbursed. *Hisa*, 24 F.Supp. 2d at 45.  According to the government, the contributions therefore were made with money that "actually" belonged to the Temple and the monks and nuns were acting as conduits for the Temple.  *Id.* Before trial, Hisa argued that as a part of her religion, she believed that the Temple does not possess "property"

separate from the monks' and nuns' property; all of the property that "belongs" to the Temple essentially "belongs" to each of the monks and nuns.   In that connection, Hisa argued that because the premise of the indictment was that monks and nuns acted as "conduits" for the Temple, the government necessarily relied on a notion of property that was contrary to her religious beliefs.   The court permitted Hisa to present evidence of her religious belief to a jury. The court reasoned that Hisa's belief that all property of the Temple was communal could negate Hisa's intent of deceiving the Federal Election Commission on the issue whether the Temple was the true source of the contributions.

Relying on the *Hisa* court's reasoning, Defendants, here, mistakenly argue that they are entitled to present to the jury evidence of their religious beliefs to negate intent.   The significant difference between *Hisa* and the present case is that in *Hisa*, the defendant's religious belief directly concerns one of the elements of the crime charged in that case.   Put differently, the court in *Hisa* permitted the defendant to show that she did not knowingly and willfully cause false statements to be made regarding the intended source of the funds because of her sincerely held belief that the Temple's funds are communal.

In this case, Defendants wish to introduce evidence
that they were acting in conformity with Jewish law; that
the alleged acts committed to coerce the victims into giving
the gets were necessary to fulfill their religious duties.
However, the very purpose of Defendants here introducing
such evidence, unlike the defendant in *Hisa*, would, at best,
only establish Defendants' motivation for committing these
alleged coercive acts in the name of religion. But, the
motivation to act in a certain manner does not negate the
specific intent of committing a crime. *See United States v.
Romano*, 849 F.2d 812, 816 n.7 (3d Cir. 1988). In other
words, while the defendants might have been motivated by
their belief that "forced" gets were necessary under Jewish
law, the specific intent to commit kidnapping to carry out
that belief is separate and distinct from their religious
belief.

As the Government correctly argues, motive cannot be
used to negate specific intent. On this point, the Eighth
Circuit has cogently explained:

> "Criminal intent" properly used refers to the mental
> state required by the particular statute which makes
> the act a crime. Once that intent has been proven, it
> is immaterial that a defendant may also have had some
> secondary, or even overriding, intent. *Id.* at 200. If
> the intent is overriding -- that is, it reflects the
> ultimate end sought which compelled the defendant to
> act -- it is more properly labeled a "motive." This
> is true even with respect to a "specific intent"

40

statute where the intent itself is stated in terms of
an "end," for example, breaking and entering with
intent to commit theft. The "end" of stealing money
still could be just a means to another more valued
consequence, such as giving to the poor; that ultimate
goal, however, would not replace or negate the intent
of stealing and would still be a "motive," while the
intent to steal would still provide the "specific
intent" required by the statute.

*United States v. Kabat*, 797 F.2d 580, 587-88 (8th Cir. 1986).

This difference between motivation and intent has been
discussed by the Third Circuit as well. For example, the
Third Circuit in *Romano* cautioned that the defendant's end
motive of protecting innocent lives could not adequately
negate or explain her specific intent to break into a
military installation. Importantly, the circuit court found
that while the defendant's beliefs there might be properly
considered at sentencing, they were not relevant for
purposes of defending the substantive charges. *Romano,* 849
F.2d at 816 n.7; *see also United States v. Platte*, 401 F.3d
1176, 1181 (10th Cir. 2005)("[t]he high-minded motives of
Defendants do not negate their intent . . . . [I]f the law
being violated is constitutional, the worthiness of one's
motives cannot excuse the violation in the eyes of the
law."); *United States v. Ahmad*, 1999 U.S. App. LEXIS 6113,
at *4 (2d Cir. 1999)(finding that an innocent motive can
neither negate one's intent nor knowledge); *United States v.
Gump*, No. 10-94, 2013 U.S. Dist. LEXIS 173355, at *42-44

41

(E.D. Tenn. May 6, 2013)(finding that Defendants' "religious convictions do not provide a defense to trespassing and, as such, are irrelevant and inadmissible at trial."); *see also United States v. Cullen*, 454 F.2d 386, 390 (7th Cir. 1971)("if the proof discloses that the prohibited act was voluntary, and that the defendant actually knew, or reasonably should have known, that it was a public wrong, the burden of proving the requisite intent has been met; proof of motive, good or bad, has no relevance to that issue.").

Based on that reasoning, I also reject Defendants' reliance on *Martines*. In that case, the defendant was charged with conspiracy to manufacture and possess with intent to distribute in excess of 100 marijuana plants. *Martines*, 903 F.Supp. 2d at 1063. The defendant sought to introduce evidence, including an expert's testimony, relating to the defendant's Rastafarian religion. In that context, the defendant wished to mount a religious defense to the element of intent to distribute. Because, as the defendant argued, the growing of marijuana in his home was consistent with his religion, he did not intend to sell or distribute marijuana. *Id.* at 1067. The court permitted the defendant to mount such a factual defense. Again, the religious belief the defendant sought to introduce in

42

*Martines* was directly related to the whether defendant intended to distribute marijuana. Therefore, such use of religious evidence to negate specific intent was proper. For the reasons I have just stated, the facts of this case are wholly different, and thus, I do not find *Martines* relevant.

Finally, *Betram* does not support Defendants' position; rather, the decision undermines it. In *Betram*, the defendant was charged with having failed to register with selective service for military duty. On appeal, the defendant argued that the district court erred by refusing to permit the defendant to show that registering for selective service violated his religious belief. *Betram*, 477 F.2d at 1330. The appellate court first found that the defendant had failed to register in accordance with law; that he unquestionably knew of the requirement; and that his refusal was intentional, but was based on his religious belief. In rejecting the defendant's argument, the court explained, "the court's charge to the jury that the appellant's religious beliefs did not constitute a defense was correct as was the court's charge as to necessity for specific intent, and although evidence as to state of mind establishing that there was no criminal intent would be admissible, the religious beliefs do not serve to nullify the presence of intent where the defendant has acted

43

knowingly." *Id.* As such, the *Betram* court's reasoning is equally applicable here: religious beliefs simply do not negate intent when a defendant has acted knowingly in contravention of law.

I note further that during oral argument, the Court inquired of Defendants which element of the crimes is negated by their religious beliefs. As to the crime of kidnapping, Defendants maintain that their religious beliefs would negate the element relating to the Government's proof that Defendants acted illegally for ransom, reward, or other benefit. In that regard, Defendants contend that they must have the opportunity to present to the jury that they did not engage in the alleged coercive actions for the purpose of obtaining money, as suggested by the Government during its opening. In other words, because the Government has placed "motive" into issue, Defendants submit that they should be able to rebut that motive by presenting evidence of their religious motivation. On that point, Defendants claim that their religious beliefs would negate the Government's proof on the element of "purpose." I do not find this argument convincing.

As I stated on the record, "other benefit" is broadly defined under the statute. In fact, in the case that Defendants cited during argument, the Fourth Circuit

44

unequivocally held that the Supreme Court and the courts of appeals "have broadly interpreted the Federal Kidnapping Act's requirement that the kidnapped person be "held for ransom or reward or otherwise." *United States v. Childress*, 26 F.3d 498, 503 (4th Cir. 1994)(quoting *United States v. Crosby*, 713 F.2d 1066, 1070 (5th Cir.), *cert. denied*, 464 U.S. 1001 (1983)). Thus, to satisfy the Act's requirement, it is sufficient for the government to show that the defendant "acted for any reason which would in any way be of benefit." *Childress*, 26 F.3d at 503. (citing *Gooch v. United States*, 297 U.S. 124, 128 (1936).[13]  Thus, the Government need not show that Defendants were benefited by money to meet its burden; instead, the benefit could be non-monetary in nature.  Even if Defendants committed the alleged crimes

---

[13]  I note that there is some indication by other courts of appeal, including the Fourth Circuit in *Childress*, that the requirement that a kidnapped person be held "for ransom or reward or otherwise" is not even an element of the federal kidnapping offense. *United States v. Martell*, 335 F.2d 764, 766 (4th Cir. 1964) (holding that the federal kidnapping statute is violated "regardless of the ultimate purpose of the kidnapper"); *Gawne v. United States*, 409 F.2d 1399, 1402-03 (9th Cir. 1969) (holding that a kidnapper's motivation is not an element of the federal kidnapping offense), *cert. denied*, 397 U.S. 943 (1970); *Clinton v. United States*, 260 F.2d 824, 825 (5th Cir. 1958) (holding that the Federal Kidnapping Act does not make the kidnapper's motivation an "ingredient of the crime"), *cert. denied*, 359 U.S. 948 (1959); *see Hayes v. United States*, 296 F.2d 657, 665-67 (8th Cir. 1961), *cert. denied*, 369 U.S. 867 (1962).

for a religious purpose, that purpose could be considered "other benefit" under the kidnapping statute.

Next, as to the crime of conspiracy, Defendants claim that their religious beliefs negate the object of the conspiracy. That argument mischaracterizes the law. As I have laid out above, the Government must prove that Defendants (1) shared unity of purpose; (2) intended to achieve a common illegal goal of kidnapping; and (3) an agreement to work toward that goal. The object of the conspiracy, in this case, would be the illegal kidnapping. Hence, to the extent that Defendants wish to introduce evidence of their religion to show that the object of the conspiracy is not to make money, that argument fails because the object, or the goal, of the conspiracy, here, is kidnapping. On the other hand, to the extent that Defendants seek to introduce this evidence to show that the object of the conspiracy is for a permissible religious purpose, I have already rejected Defendants' argument on motive in this regard. In sum, the Government must prove each and every element of kidnapping and conspiracy; and, Defendants' motivation or purpose – even if it is based on their religion – for committing these crimes is not an element, and thus, not relevant.

Finally, Goldstein argues that his religious beliefs are highly relevant as these beliefs pertain to his intent, motive and state of mind. Goldstein argues that he did not possess the specific intent to commit kidnappings because he sincerely believed that his actions, as a scribe or scrivener for the writing of the get, were authorized by religious doctrine. This argument is similarly rejected on the basis, as explained above, that religious motivation simply cannot negate the intent to commit a crime. Accordingly, Defendants in this case are not permitted to introduce their religious belief to negate their specific intent of committing conspiracy, attempted kidnapping or kidnapping.

Next, Defendants seek to introduce evidence to show that because the victim-husbands consented to be bound by the halakhic process of the "forced" get, at the time of the marriage, this consent is a complete defense to their kidnapping-related charges. The Court disagrees.

While consent can be a defense to kidnapping, it has to be specific and cannot be prospective in nature. As one necessary element, a federal kidnapping charge requires that the victim be an unconsenting person. *United States v. Davis*, 19 F.3d 166, 169 (5th Cir. 1994). Thus, consent by a victim can be a valid defense to the crime. However, the

47

consent must be valid under the circumstances; to consent, in the context of a kidnapping, a person must (1) act freely and voluntarily and not under the influence of threats, force, or duress; (2) have knowledge that he was being physically moved; and (3) possess sufficient mental capacity to make an intelligent choice whether to be physically moved by the other person. *See, e.g.*, *United States v. Moreno-Florean*, 542 F.3d 445, 454 (5th Cir. 2008); *see United States v. Williams*, 110 F.3d 50, 52 (9th Cir. 1997); *United States v. Boone*, 959 F.2d 1550, 1557 (11th Cir. 1992); *see also Vega v. Arnold*, 2014 U.S. Dist. LEXIS 89000, at *17 (C.D. Cal. Jun. 30, 2014)("In order to consent, a person must act freely and voluntarily and know the nature of the act."); *Daniels v. McDonald*, 2012 U.S. Dist. LEXIS 138570, at *45 (N.D. Cal. Sep. 26, 2012)("To consent, a person must: One, act freely and voluntarily and not under the influence of threats, force, or duress; two, have knowledge she was being physically moved; and three, possess sufficient mental capacity to make an intelligent choice whether to be physically moved by the other person. Being passive does not amount to consent. Consent requires a free will and positive cooperation in act or attitude.").

Even if a victim consented to being transported initially, he/she has the opportunity to revoke his/her

consent during the commission of the alleged crime. *See, e.g., United States v. Eagle Thunder*, 893 F.2d 950, 952-53 (8th Cir. 1990)(finding that although the victim voluntarily agreed to accompany the defendant, she did not consent "to the kind of trip eventually undertaken"); *United States v. Wesson*, 779 F.2d 1443, 1444 (9th Cir. 1986); *United States v. McBryar*, 553 F.2d 433, 434 (5th Cir.)(kidnapping conviction upheld where defendant agreed to take victim to one destination but drove in opposite direction and refused her requests to be let out of automobile), *cert. denied*, 434 U.S. 862, (1977); *Martinez v. Gov't of the V.I.*, 2008 U.S. Dist. LEXIS 107613, at *11 n. 4 (D.V.I. Feb. 26, 2008)("In a kidnapping context, even if a victim initially goes voluntarily with a defendant, if at any point [his] consent is withdrawn, defendant's use of force or fear to continue the [transport] over a substantial distance constitutes kidnapping.").

Here, as a defense to kidnapping, Defendants seek to introduce evidence that the victims consented to the divorce proceedings under Orthodox Jewish law. It is Defendants' position that because the victims consented to "forced" gets when they signed the ketubah, they have consented to the alleged later actions, including physical restraint, taken by Defendants. During oral argument, Defendants further

49

elaborated on this point.  They urged the Court to look to how consent is defined under Jewish law, and in that connection, what Defendants believed the victims have consented to at time of the alleged kidnapping.  I disagree.

First, consent under Orthodox Jewish law is not the type of voluntary and knowing consent that is required for a defense to kidnapping under the laws of the United States. Indeed, the only viable way Defendants can assert a valid consent defense, is to show that the victims had consented to being physically removed during the commission of the crime, and that the consent was not under the influence of threats, force, or duress.  *See Davis*, 19 F.3d at 169.  This is not what Defendants proffered.  It is, therefore, irrelevant whether the victims had prospectively consented to be subjected to giving "forced" gets under Jewish law; indeed, at the time when the victims signed the ketubah, they could not have knowingly and voluntarily consented to being physically removed against their will, because they did not possess the knowledge of Defendants' actions undertaken during the alleged kidnappings.  In other words, a victim cannot consent to what he/she does not know.  See *Vega,* 2014 U.S. Dist. LEXIS at *17 ("In order to consent, a person must act freely and voluntarily and know the nature of the act.").

It follows that, in the context of consent, Defendants would have to believe that the victims gave their assent *at the time of the commission of the alleged wrongful acts*. In other words, because consent cannot be prospectively given, Defendants' belief – erroneous or not -- that the victims had consented to being restrained when they had signed the ketubah years ago is inconsistent with how consent applies in the context of the kidnapping statutes. Thus, it would be unreasonable for Defendants to rely on the victims' consent allegedly given years before the kidnapping.

More importantly, this evidence would be unduly prejudicial pursuant to Fed. R. Evid. 403. Rule 403 permits evidence that is otherwise permissible to be excluded because its probative value is outweighed by a danger of one or more of the following: (1) unfair prejudice (3) confusing the issues; (3) misleading the jury; (4) undue delay; (5) wasting time; or (6) needlessly presenting cumulative evidence. *See Id.* Here, presenting a victim's consent in a religious context would not only run the risk of confusing and misleading the jury as to which law Defendants must adhere, it would carry a significant potential for jury nullification. *See United States v. Macinnes*, 23 F. Supp. 3d 536, 546 (E.D. Pa. 2014); *United States v. DeMuro*, 677 F.3d 550, 565 (3d Cir. 2012). In fact, because I have

rejected Defendants' religious defense based on RFRA, to permit the jury to find that Defendants committed the allegedly illegal acts because of their "sincere religious motive" or a belief that the actions were justified by "some higher power," would open the door to jury nullification. That purpose is highly prejudicial under Rule 403 and without probative value; therefore, I will disallow the introduction of such religious evidence. *See United States v. Dougherty*, 473 F.2d 1113, 1139-40 (D.C. Cir. 1972).

I note, however, this is not to say that Defendants cannot cross-examine the victims on whether – at the time the alleged criminal acts were committed – they gave consent. But, Defendants may not question the victims regarding any facts relating to the signing of the ketubah in this context.

Accordingly, Defendants are not permitted to introduce any religious evidence to negate their criminal intent, as well as any evidence of victims' consent, in a religious context, when they signed the Ketubah.

**CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss based on their RFRA defense is **DENIED**; and Defendants' application to introduce evidence of their religious beliefs and to mount a consent defense is **DENIED**.

An appropriate Order shall follow.


**DATED:** March 19, 2015         /s/         Freda L. Wolfson
                                  **Freda L. Wolfson**
                                  **United States District Judge**

53